DATE FILED: December 28, 2023 5:06 PM
FILING ID: A842427DF0195
CASE NUMBER: 2023CV31140

| | |
|---|---|
| **DISTRICT COURT, BOULDER COUNTY STATE OF COLORADO**<br>1776 6th Street<br>Boulder, Colorado 80302<br><br>**Plaintiff: MICHAEL FINNESY**<br><br>v.<br><br>**Defendant: STATE FARM FIRE AND CASUALTY COMPANY** | ^COURT USE ONLY^ |
| *Attorneys for Plaintiffs*:<br>Katherine E. Goodrich, No. 48853<br>Rodney J. Monheit, No. 48919<br>MoGo LLC<br>600 17th Street, Suite 2800 South<br>Denver, Colorado 80202<br>Tel: (303) 357-1317<br>katie@mogollc.com<br>rodney@mogollc.com | **Case No:**<br><br>**Div.** |
| **COMPLAINT AND JURY DEMAND** | |

COMES NOW the Plaintiff Michael Finnesy, by and through his attorneys at MoGo LLC, and for his Complaint against State Farm Fire and Casualty Company ("Defendant") alleges and avers as follows:

### INTRODUCTION

1. In December 2021, a devastating wildfire broke out in Boulder County, Colorado. Strengthened by wind gusts exceeding 100 miles per hour, the "Marshall Fire" burned 6,080 acres and destroyed over 1,000 homes.[1]

---

[1] https://www.cbsnews.com/colorado/news/boulder-county-marshall-fire-two-fires-xcel-energy/ (accessed December 28, 2023).

2. On December 31, 2021, President Biden declared the Marshall Fire a major disaster and ordered Federal aid to supplement State and local recovery efforts.[2]

3. This action concerns the delay and denial of payment of insurance benefits covering Plaintiff's home, and all of the belongings inside, which burned to the ground as a result of the Marshall Fire.

4. Colorado law recognizes that insurance is a unique product that is purchased not for commercial advantage, but for peace of mind; for protection against financial calamity and uncertainties. An insurance company's promise of security has real value. Those fortunate enough to never experience loss, and therefore never collect a penny from their insurers, spend their money for the sole purpose of security and peace of mind.

5. Colorado law recognizes that there is a disparity in bargaining power between the insurer and the insured: "Contract damages offer no motivation whatsoever for the insurer *not* to breach. If the only damages an insurer will have to pay upon a judgment of breach are the amounts that it would have owed under the policy plus interest, it has every interest in retaining the money, earning the higher rates of interest on the outside market, and hoping eventually to force the insured into a settlement for less than the policy amount."[3]

6. In Colorado, insurance companies are subject to special remedies if they fail to honor their promises. In this action, Plaintiff seeks damages for Defendant's breach of insurance contract, bad faith breach of insurance contract, and violation of C.R.S. § 10-3-1115.

---

[2] https://www.whitehouse.gov/briefing-room/statements-releases/2022/01/01/president-joseph-r-biden-jr-approves-colorado-disaster-declaration/ (accessed December 28, 2023).
[3] *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 468 (Colo. 2003).

EXHIBIT A

## PARTIES, JURISDICTION & VENUE

7. Plaintiff is a citizen of the State of Colorado.

8. Defendant is an insurance company (NAIC ID: 25143) domiciled in the State of Illinois, with its headquarters in Bloomington, Illinois.

9. At all relevant times, Defendant was authorized to conduct the business of insurance in the State of Colorado, and conducted the business of insurance in Colorado.

10. Defendant sold Plaintiff a homeowner's insurance policy, number 96-EG-7353-4 (the "Policy"), which covered real and personal property located at 111 Cayauga Way, Superior, Colorado 80027-8609 (the "Property").

11. This Court has subject matter jurisdiction because the events complained of occurred in Colorado and the resolution of this dispute requires the application of Colorado law. Colo. Const. art. VI § 9(1).

12. This Court has personal jurisdiction over Defendant under section 13-1-124(1)(a), (b) and (d), C.R.S., because Defendant conducted the business at issue in this action, committed tortious acts and contracted to insure the Property in Boulder County, Colorado.

13. Pursuant to C.R.C.P. 98(c), venue is proper in this judicial district, which Plaintiff designates as the place of trial.

## FACTUAL ALLEGATIONS

14. On December 30, 2021, Plaintiff's house and everything inside burned to the ground in the Marshall Fire.

15. On or about January 8, 2022, Defendant sent an adjuster, Jason Wessinger, to the Property for an inspection, in which the adjuster confirmed that the Property was a total loss.

EXHIBIT A

16. On or about January 20, 2022, Defendant's adjuster, Mr. Wessinger, completed an estimate of the cost to rebuild the Property.

17. A true and accurate representation of Defendant's January 20, 2022 estimate totals, broken down by Policy coverage, is depicted in the table below:

| COVERAGE | TAX | GCO&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Coverage A - Dwelling - 33 Fire, Lightning, & Removal | 8,340.28 | 43,905.82 | 263,428.87 | (22,955.04) | 240,473.83 |
| Coverage A - Dwelling - 33 Fire, Lightning, & Removal - Trees, Shrubs and Other Plants | 46.05 | 257.80 | 1,546.72 | (0.00) | 1,546.72 |
| Coverage A - Dwelling Extension - 33 Fire, Lightning, & Removal | 144.67 | 894.76 | 5,368.68 | (1,309.74) | 4,058.94 |
| Total | 8,531.00 | 45,058.38 | 270,344.27 | (24,264.78) | 246,079.49 |

18. As used in the above table, the term "RCV" means "replacement cost value," and the term "ACV" means "actual cash value."

19. According to Defendant's January 20, 2022 estimate, the replacement cost value of the dwelling on the Property totaled $263,428.87, with an actual cash value of $240,473.83 (a deduction of about 8.7% to account for pre-loss depreciation).

20. As stated in the Policy's declaration page, the limit of liability under Coverage A - Dwelling is $367,900.00. Therefore, Defendant's January 20, 2022 estimate of the cost to rebuild the dwelling totaled about $104,000 less than the stated Policy limit under Coverage A - Dwelling.

21. The Policy includes Inflation Coverage. The Policy's declaration page lists the "Inflation Coverage Index" as 350.2. Defendant did not apply the Policy's Inflation Coverage to Plaintiff's claim.

22. In a letter dated January 22, 2022, Defendant's adjuster Keith Broomfield wrote Plaintiff to explain that his claim had been reassigned from Mr. Wessinger to Keith Broomfield.

EXHIBIT A

The letter also explained that under Coverage A - Dwelling, Defendant had issued payment of $245,079.49, which equals the actual cash value of the January 20, 2022 estimate less the $1,000.00 deductible. In regards to Coverage C - Loss of Rent, Mr. Broomfield explains that "No payment has currently been issued." However, "[t]his portion of the claim is being closely monitored by Kevin Garcia."

23. In a letter dated January 14, 2022, Defendant's claim specialist, Kevin Garcia, wrote to Plaintiff stating, "At this point, we are not able to complete an evaluation of your claim. We will give you claim further consideration once we receive the requested information as outlined below:

- Most recent lease agreement
- Most recent tax return, Schedule E"

24. In a letter dated January 25, 2022, Mr. Garcia wrote to Plaintiff stating, "We received a copy of the first page of the 2020 Schedule E form and a copy of the Lease Agreement. Thank you for your prompt response to our request. Anticipate a follow up on the Loss of Rent claim by January 27, 2022."

25. In a letter dated January 29, 2022, Mr. Garcia wrote to Plaintiff stating, "We are unable to complete the evaluation of your claim for Loss of Rent. Please contact to discuss your claim. Also, please submit a copy of Statement 1 to clarify line 19, Other Expense on your Schedule E tax form."

26. In a letter dated February 16, 2022, Mr. Garcia wrote that "State Farm sent an Electronic Funds Transfer (EFT) on February 16, 2022 to the bank account you provided us."

-5-

Mr. Garcia provided payment details explaining that the payment was for Business Interruption for the amount of $4,591.21.

27. In a letter dated February 26, 2022, Mr. Garcia wrote that "State Farm sent an Electronic Funds Transfer (EFT) on February 26, 2022 to the bank account you provided us." Mr. Garcia provided payment details explaining that the payment was for Business Interruption for the amount of $2,223.87.

28. In a letter dated March 28, 2022, Mr. Broomfield wrote that "State Farm sent an Electronic Funds Transfer (EFT) on March 28, 2022, to the bank account you provided us. Mr. Broomfield provided payment details explaining that the payment was for personal property for the amount of $2,595.60.

29. In a letter dated March 28, 2022, Mr. Broomfield outlined a "Summary of Claim Status." That is, Defendant paid $245,079.49 under Coverage A - Dwelling; $2,595.60 under Coverage B - Personal Property; and $6,815.08 under Coverage C - Loss of Rent. Mr. Broomfield directed Plaintiff to "continue to submit[] invoices for payment" under Coverage C - Loss of Rent.

30. In another letter dated March 28, 2022, Mr. Broomfield stated, "Enclosed please find payment in the amount of $245,079.49, which replaces the previous check/draft, number 120720179J. The payment is being reissued because you requested a new payment. If you locate check/draft 120720179J, please destroy it and do not attempt to deposit or cash it as a stop payment has been issued on this check/draft."

31. In a letter dated April 20, 2022, Defendant's "External Claim Resource - Pilot," Patti Mcqueen, wrote to Plaintiff saying, "Thank you for the opportunity to review your claim.

EXHIBIT A

Enclosed please find payment in the amount of $245,079.49, which replaces the previous draft, number 120792748J. The draft is being reissued because of an error on the original draft. If you locate draft 120792748J, please destroy it and do not attempt to deposit or cash as a stop payment has been issued on this draft."

32. In another letter dated April 20, 2022, Defendant's "External Claim Resource - Pilot", Patti Mcqueen, wrote to Plaintiff saying, "Our payment in the amount of $4,447.74, in settlement of your Loss of Use claim has been sent to you electronically. Please refer to the enclosed Summary of Loss."

33. On May 8, 2023, Plaintiff entered into a Building Construction Contract with Remington Rebuild, LLC, to rebuild the Property for the price of $517,747.00.

34. In a letter dated June 21, 2022, Ms. Mcqueen wrote to Plaintiff saying, "Thank you for the opportunity to review your claim. Our payment in the amount of $4447.74 in settlement of your Loss of Use claim has been sent to you electronically."

35. In a letter dated July 5, 2022, Ms. Mcqueen provided Plaintiff with another Summary of Claim Status, in which Ms. Mcqueen explained that Defendant has "issued payments in the amount of $245,079.49" under Coverage A - Dwelling; "issued an advance in the amount of $2,595.60" under Coverage B - Personal Property; and "$15,710.56 through July 31, 2022" under Coverage C - Loss of Rent. Ms. Mcqueen explained further that "The total monthly Loss of Rent payment has been calculated based upon the recordings made on your schedule E. We will continue to monitor the rebuild progression through to the completion of the home, or when the policy limits are exhausted. To update our file, can you please provide the

EXHIBIT A

updated status on the rebuild. Please submit any building permits applied for, and your contractors (sic) signed contract if applicable, along with the contact information."

36. In a letter dated August 1, 2022, Ms. Mcqueen reiterated the exact same information expressed in her July 5, 2022 letter.

37. In a letter dated August 30, 2022, Ms. Mcqueen reiterated the exact same information expressed in her July 5, 2022 letter.

38. In a letter dated September 26, 2022, Ms. Mcqueen reiterated the exact same information expressed in her July 5, 2022 letter, except she updated the amount paid under Coverage C - Loss of Rent to $17,934.43.

39. In a letter dated October 21, 2022, Ms. Mcqueen reiterated the exact same information expressed in her July 5, 2022 letter.

40. In a Summary of Loss dated September 9, 2022, Defendant's payment under Coverage C - Loss of Rent was described as being a monthly payment of $2,223.87, which equates to $26,686.44 per year.

41. Plaintiff rented out the Property for a rent amount of $2,300.00 per month, through June 30, 2022.

42. In a letter dated November 17, 2022, Ms. Mcqueen reiterated the exact same information expressed in her July 5, 2022 letter, except that she updated the Coverage C - Loss of Rent summary to say: "As of September 29, 2022, we have paid your Loss of Rent, in the amount of $26,686.44 through December 31, 2022."

43. In a letter dated December 13, 2022, Ms. Mcqueen reiterated the exact same information expressed in her November 17, 2022 letter.

EXHIBIT A

-9-

44.     In a letter dated December 15, 2022, Defendant's "External Claim Resource - Renfroe," Meadow Atkins, advised that she would be taking over the claim from Ms. Mcqueen.

45.     The prevailing competitive market price to rebuild the dwelling exceeded the policy limits.

46.     The prevailing competitive market price to rebuild the dwelling, less depreciation and the deductible, exceeded the Policy's limit under Coverage A - Dwelling.

47.     State Farm has not revised its estimate to reflect the prevailing competitive market price to rebuild the Property.

48.     State Farm was legally obligated to timely pay the actual cash value of the loss, less the deductible. For this claim, that amount was the full Coverage A - Dwelling policy limit.

49.     State Farm knew or reasonably should have known that its low-ball estimate was inadequate to rebuild the Property.

**FIRST CLAIM FOR RELIEF**
(Breach of Insurance Contract)

50.     Plaintiffs incorporate the above allegations as if fully set forth.

51.     The Policy is a contract.

52.     Plaintiffs complied with all conditions and obligations under the Policy, or the nonperformance of any such conditions was waived by Defendant.

53.     Defendant breached the contract by, among other things, failing to prepare an estimate that is adequate to restore the Property's dwelling to its condition before the loss, failing to pay the actual cash value of the loss which exceeded the Coverage A - Dwelling limit, and failing to pay the full amount covered under Coverage C - Loss of Rent.

EXHIBIT A

54. As a direct and proximate result of Defendant's breach, Plaintiffs are entitled to damages to be proved at trial.

### SECOND CLAIM FOR RELIEF
(Bad Faith Breach of an Insurance Contract)

55. Plaintiffs incorporate the above allegations as if fully set forth.

56. Under the Policy's implied covenant of good faith and fair dealing, Defendant covenanted that it would deal with Plaintiffs fairly and honestly, and do nothing to impair, hinder, or injure their rights to benefits under the Policy.

57. Through the act and omissions described above, Defendant breached that covenant, as its conduct fell below the applicable common law and industry standards of care, violated the duties of good faith and fair dealing, and constituted the tort of bad faith breach of an insurance contract.

58. In October 2020, Grand County, Colorado suffered a devastating wildfire known as the East Troublesome Fire. Many of Defendant's insureds were affected by the East Troublesome Fire, and many of them were underinsured.

59. Defendant was the largest issuer of homeowner's insurance policies in Colorado with a 20.97% market share as of the date of the Marshall Fire. The homeowner's insurance carrier with the second-largest market share in Colorado held just 5.8%.

60. Many of those affected by the Marshall fire were State Farm's insureds and, just like in the East Troublesome Fire, they were underinsured.

61. Defendant knew or should have known that its insureds, including Plaintiff, were underinsured.

-10-

62. There was no reasonable basis upon which Defendant could conclude that Plaintiff was over-insured by about $100,000.00.

63. Defendant knew or recklessly disregarded that Plaintiff was underinsured at the time Defendant completed its January 20, 2022 estimate, but still determined that the replacement cost value was less than the Policy's Coverage A - Dwelling limit by about $100,000.00.

64. With respect to Coverage C - Loss of Rent, Defendant knew that Plaintiff was renting out the Property for $2,300.00 per month, but decided to pay about $75 less than that amount per month.

65. Defendant's acts and omissions were unreasonable and Defendant knew so.

66. Defendant's acts and omissions were committed with reckless disregard of Plaintiffs' reasonable expectations as an insured under the Policy.

67. Defendant breached its duty of good faith and fair dealing through the following unreasonable acts, among others;

    a. Misrepresenting the pertinent facts and insurance policy provisions relating to coverages at issue;

    b. Failing to adopt and implement reasonable standards for the prompt payment of claims arising under the Policy;

    c. Failing to adequately convey the coverages available under the Policy;

    d. Not attempting in good faith to effectuate prompt, fair, and equitable settlement of the claim even though liability had become reasonably clear;

EXHIBIT A

e. Failing to ensure that the repair estimate it prepared was adequate to restore the property within a reasonable time to its condition before the loss;

f. Intentionally deflating its estimated cost to rebuild the Property so that the limits of insurance would not be increased to the full value that was available under the Policy;

g. Failing to timely inform Plaintiffs of the coverages he was entitled to under the Policy; and

h. Other conduct to be revealed in discovery.

68. Defendant took unreasonable positions with respect to Plaintiffs' claim for benefits that a reasonably careful insurer would not take under the same or similar circumstances.

69. An objectively reasonable insurer in Defendant's position would have promptly adjusted its estimate to reflect the market price in Plaintiff's geographic area to rebuild the Property.

70. As a direct and proximate result of Defendant's bad faith breach of the Policy, Plaintiffs suffered damages in amounts to be proved at trial.

### THIRD CLAIM FOR RELIEF
(Violation of C.R.S. § 10-3-1115 & Relief Under C.R.S. § 10-3-1116)

71. Plaintiffs incorporate the above allegations as if fully set forth.

72. Section 10-3-1115(1), C.R.S., forbids insurers like Defendant from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of any first-party claimant.

-12-

73. Section 10-3-1115(2), C.R.S., provides that "an insurer's delay was unreasonable if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action."

74. Plaintiffs are first-party claimants within the meaning of C.R.S. § 10-3-1115(1)(b).

75. Defendant is an entity engaged in the business of insurance.

76. Defendant delayed authorizing payment of covered benefits owed under Coverage A without a reasonable basis.

77. A reasonable insurer in Defendant's position would have revised its estimate to reflect the prevailing competitive price of the repairs, in accordance with Colorado law, and would have promptly paid the actual cash value of that revised estimate.

78. Therefore, Plaintiffs are entitled to damages awardable under C.R.S. § 10-3-1116(1), separate from and in addition to those remedies and damages available under any other claims for relief.

WHEREFORE Plaintiffs respectfully request the Court enter judgment in his favor on all claims and award damages:

    a. For all covered benefits due and owing under the Policy;

    b. For pre- and post-judgment interest, as permitted by law;

    c. For economic and non-economic damages as permitted by law;

    d. For attorney's fees, court costs, and two times the covered benefits unreasonably delayed and denied, as permitted under C.R.S. § 10-3-1116(1); and

    e. For such other and further relief as this Court deems fair and just.

**PLAINTIFFS DEMANDS A JURY ON ALL ISSUES SO TRIABLE**

DATED: December 28, 2023                    Respectfully submitted,

**MoGo LLC**

*s/ Rodney J. Monheit*
Katherine E. Goodrich
Rodney J. Monheit

*Attorneys for Michael Finnesy*